IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THEODORE D. LAWRENCE | ) | CASE NO. 5:11-cv-2684 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Theodore D. Lawrence ("Plaintiff" or "Lawrence") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, it is recommended that the Commissioner's decision be **AFFIRMED**.

## I.  Procedural History

Lawrence filed an application for Disability Insurance Benefits on or about May 6, 2009.  Tr. 16, 121-126.  His application alleged a disability onset date of February 15, 2007.  Tr. 123 129.  Lawrence alleged disability based on mental health problems including, bipolar disorder, obsessive compulsive personality disorder, and depression.  Tr. 93, 96, 101, 105, 135.  After his application was denied initially and upon reconsideration (Tr. 93-99, 101-106), Lawrence

requested a hearing (Tr. 107-108), and an administrative hearing was held before Administrative

Law Judge Traci M. Hixon ("ALJ"), via videoconference, on November 2, 2010.  Tr. 56-89.

In her May 26, 2011, decision (Tr. 13-32), the ALJ determined that Lawrence had not

been under a disability from February 15, 2007, through the date of the ALJ's decision.  Tr. 27.

Lawrence requested review of the ALJ's decision by the Appeals Council.  Tr. 11-12.  On

November 23, 2011, the Appeals Council denied Lawrence's request for review, making the

ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal and Vocational Evidence

Lawrence was born on June 8, 1961.  Tr. 59, 123.  He is married with three children.  Tr.

78, 302, 311.  He completed high school and approximately three years of college in the areas of

electronics and respiratory therapy but he did not finish either course of study.  Tr. 60, 140.  He

has had somewhere between 30 to 50 different jobs and indicated that he was fired from most of

them.  Tr. 65.  Lawrence had most recently owned and operated his own game store.  Tr. 65-66,

188-191.  He indicated that he went out of business because of slow sales during a poor

economy.  Tr. 188.   Before running his own business most of his more recent jobs entailed

working with computers.  Tr. 69.  Prior to that, he indicated he held a wide variety of jobs, i.e.,

metalizing, security guard, factory worker, call center operator.  Tr. 69.

### B.      Medical Evidence

#### 1.       2004 and 2005 Medical Records

In May 2004, while working at Diebold, Lawrence was seen by Behavioral Health

Strategies - Life Management Consultants.  Tr. 266-271.  Lawrence was diagnosed with bipolar

disorder, rule out schizoaffective disorder.  Tr. 270.  Following the May consultation, Lawrence

continued to attend counseling sessions.  Tr. 275-284.  Lawrence showed on-and-off-again improvement in his anxiety and stress levels.  Tr. 275-284.  In August 2004, Dr. Samina Zaidi, M.D., completed a psychiatric evaluation and diagnosed Lawrence with Bipolar I – mixed.  Tr. 262-265.  Lawrence's case with Life Management Consultants was closed in June 2005 with notations of moderate improvement.  Tr. 271

### 2.      Portage Path Behavioral Health

Beginning in May 2007, Lawrence began treatment at Portage Path Behavioral Health ("Portage Path").  Tr. 416.  Lawrence continued treatment through at least September 2010.  Tr. 316-322, 350-417, 423-438.   Throughout his counseling, treatment providers noted that Lawrence showed some progress and an ability to manage his mental condition with medication. Tr. 320, 352, 357, 358, 361, 363, 366, 367, 370, 371, 377, 381, 382, 383, 387, 388, 395, 398, 401, 402, 403, 404, 411, 413, 425, 426, 435, 436.

### a.      Todd Wilke, M.D., Psychiatric Evaluation

On June 12, 2007, Dr. Todd Wilke completed a psychiatric evaluation.  Tr. 300-302. During the evaluation, Lawrence reported being depressed and having suicidal ideations his entire life but with no firm plans for suicide.  Tr. 300.  He reported taking medication in the past for bipolar disorder and Lawrence's wife indicated that, while he was taking the prescribed medication, Lawrence was generally doing better, i.e., he was better able to tolerate noise and being around people.  Tr. 300.  Lawrence reported having poor concentration and attention.  Tr. 300.  Dr. Wilke observed Lawrence as fidgety and anxious with a depressed mood.  Tr. 301.  He described Lawrence's insight as fair to poor with his judgment intact.  Tr. 302.  Dr. Wilke diagnosed Lawrence with bipolar disorder, Type II; anxiety disorder, not otherwise specified;

and dependent traits, and he was assessed a GAF score of 45.[1]  Tr. 302.  He recommended

medication and counseling.  Tr. 302.

### b.      Ki-Moon Hong, M.D., Mental Status Questionnaire

On June 12, 2007, Dr. Ki-Moon Hong completed a Mental Status Questionnaire.  Tr.

303-305.  Dr. Hong described Lawrence as having mood swings, a short fuse, and a low

frustration tolerance.  Tr. 303.  Dr. Hong also described Lawrence as having difficulty

concentrating and completing tasks, short term memory problems, black and white thinking,

average intelligence, limited insight, and problems dealing with co-workers, bosses, and

adapting.  Tr. 303-304.

### c.      Judith Uhlar, LISW Daily Activities Questionnaire

On June 18, 2007, social worker Judith Uhlar completed a Daily Activities

Questionnaire.  Tr. 306-307.  She noted that she first saw Lawrence on May 29, 2007.  Tr. 307.

She indicated that Lawrence has a low frustration tolerance and cannot be around others without

arguing.  Tr. 306.  She noted that Lawrence had lost approximately 80 percent of his prior jobs.

Tr. 306.  Ms. Uhlar noted that Lawrence cannot manage money well but he can perform

household chores, attend to his personal hygiene, shop, drive and engage in hobbies, i.e.,

dungeons and dragons.  Tr. 307.  She noted that he is reliable in keeping his appointments and is

compliant with treatment plans.  Tr. 307.

### d.      Professional Clinical Counselor Michael Hovancsek and Psychiatrist
###         Yuan-Hua Thakore, M.D., Disability Questionnaire

---

[1] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

On July 21, 2009, Professional Clinical Counselor Michael Hovancsek and Psychiatrist Yuan-Hua Thakore, M.D., submitted a disability questionnaire and treatment plan review to the Bureau of Disability Determination.  Tr. 318-320.  They indicated that Lawrence had been diagnosed with bipolar and personality disorders that cause him to have multiple conflicts with others that he does not understand.  Tr. 319.  They opined that Lawrence is unable to understand emotional thinking.  Tr. 319.  They indicated that Lawrence has no significant restrictions on daily activities.  Tr. 319.  They indicated that his impairments have impacted his employment and willingness to accept various forms of charity available to him.  Tr. 319.  They stated that Lawrence is extremely rigid in his thinking, he refuses to consider any other perspectives, and he lacks insight into how his rigid thinking contributes to his conflicts with others.  Tr. 319.  They indicated that the symptoms have persisted for his entire life.  Tr. 320.  They noted that, although Lawrence is trying to understand other perspectives, he is unwilling to change his own thoughts and behaviors.  Tr. 320. They stated that Lawrence manages his bipolar disorder reasonably well with medication. Tr. 320.

### e. Professional Clinical Counselor Michael Hovancsek Medical Source Assessment

On July 6, 2010, Michael Hovancsek completed a Medical Source Assessment (Mental). Tr. 421-422.  Mr. Hovancsek rated Lawrence's mental abilities in the categories of understanding and memory; sustained concentration and persistence; social interaction; and adaptation.  Tr. 421-422.  Mr. Hovancsek indicated that Lawrence could not: (1) work in coordination with or in proximity to others without being distracted by them; (2) interact appropriately with the general public; (3) accept instructions and respond appropriately to criticism from supervisors; or (4) get along with co-workers or peers without distracting them or

exhibiting behavioral extremes.  Tr. 421-422.  He also indicated that Lawrence would have noticeable difficulty, more than 20 percent of the workday, in his ability to carry out detailed instructions.  Tr. 421.  Mr. Hovancsek stated that Lawrence's constant conflicts occur because he is unable to understand other people's perspectives.  Tr. 422.  He indicated that Lawrence is extremely rigid and moralistic, i.e., refusing a church's food donations because he believes that their theory is intellectually invalid.  Tr. 422.

### 3.    Consultative Examining Physicians

#### a.    Joseph Perry, Ph.D.

On July 6, 2007, Dr. Joseph Perry, Ph.D. completed a consultative psychological evaluation.[2]  Tr. 310.  As part of the evaluation, a Minnesota Multiphasic Personality Inventory – 2 (MMPI-2) was completed.[3]  Tr. 313.   Dr. Perry opined that the test scores were "consistent with a mood disorder in addition to an overlay of some thought disorder" and that the scores indicated that Lawrence had a "poor orientation to relating to people" and that "he is likely to have significant social misinterpretations when relating to others."  Tr. 313.  Dr. Perry also indicated that the MMPI-2 indicated the Lawrence had "symptoms of bipolar 2 disorder with depression as a major affect with some mania reported."  Tr. 313.

A Bipolar Screening Assessment was also completed and "indicated multiple indications of meeting the diagnostic criteria for bipolar disorder" including specific symptoms of mania.

---

[2] At Lawrence's request, his wife was present for most of the general interview.  Tr. 310.  She was not present for the mental status examination or Minnesota Personality Inventory and the Bipolar Screening Assessment.  Tr. 310.

[3] According to Dr. Perry, the MMPI-2 results indicated an elevated profile and therefore raised some question about the validity of the tests.  Tr. 313.  Per Dr. Perry, the high F scale indicated that Lawrence was "likely to endorse items of more severe problems than would be true of himself."  Tr. 313.  Dr. Perry also stated that the low defensiveness scale also indicated that Lawrence was "likely to directly express problems to a greater extent than a typical person."  Tr. 313.  However, notwithstanding the foregoing concerns, Dr. Perry considered the results valid for interpretation.  Tr. 313.

Tr. 313.   Dr. Perry noted that the bipolar symptoms "do appear to be mild in nature when actually reviewed with him [Lawrence]."  Tr. 313.

Dr. Perry reported that Lawrence's "more recent focus on a bipolar disorder during the past few months has helped him with insight and judgment about his problems and getting correct treatment."  Tr. 313.  Lawrence indicated to Dr. Perry that he hoped "to recover from his conditions and be able to return to work in the future as owning his own small business."  Tr. 313.

Dr. Perry's summary conclusions included diagnoses of bipolar 2 disorder with most recent episodes hypo-manic and mixed; generalized anxiety disorder; and a GAF score of 53.[4] Tr. 314.   He opined that Lawrence had moderate limitations in his ability to relate to others including fellow workers and supervisor, and in his ability to withstand stress and pressure associated with day-to-day work activities.  Tr. 314.   He also opined that Lawrence had no limitations in his ability to understand and follow instructions or in his ability to maintain attention to perform simple repetitive tasks.  Tr. 314.

### b.    Sudhir Dubey, Psy.D.

On September 16, 2009, Dr. Sudhir Dubey, PsyD, also completed a consultative psychological examination.[5]  Tr. 324-328.  During the examination, Lawrence's behavior was normal and he was cooperative.  Tr. 326.  His affect was appropriate for the content of the interview and his emotional reactions were within normal limits.  Tr. 326.

Lawrence reported that his past relationship with his sister was bad but that his current relationship with her was okay.  Tr. 324.  He reported that his relationship with his wife and

---

[4]A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 34.

[5] Lawrence attended the evaluation alone.  Tr. 324.

children was okay, although distant with his 14 year old daughter.  Tr. 324-325.  He reported that he received emotional and financial support from his mother, wife, a friend and the church.  Tr. 324-325.

Lawrence reported that he stopped working when his business closed and indicated that the business closed because it was not making a profit and he reported that his employment was not affected by his mental or physical disorder.  Tr. 325.  However, he also reported that he does have difficulty keeping employment due to conflict and that his current physical and psychological symptoms affect his ability to work.  Tr. 325.

Lawrence indicated that prior mental health treatment had been unsuccessful; he acknowledged that he had been uncooperative with prior treatment because he would stop going because of a move or lack of insurance.  Tr. 325.  He described his mood as generally being depressed throughout his life and his reported symptoms were consistent with mild depression.  Tr. 326.  He also reported feelings of general anxiety.  Tr. 326.  Lawrence reported that he experiences mood swings, but that they are level with medication.  Tr. 326.  He indicated that he sleeps about 8 hours on a daily basis and, when he wakes, he feels rested.  Tr. 326.

Lawrence reported problems with concentration and remembering things.  Tr. 327.  Overall, Dr. Dubey estimated that Lawrence's level of cognitive functioning to be within the average range.  Tr. 327.  Lawrence reported that he was able to perform activities of daily living without much assistance; he noted that his wife handles the finances.  Tr. 327.

Dr. Dubey's summary conclusions included diagnoses of obsessive compulsive disorder; bipolar type II disorder, most recent episode depressed; and a GAF score of 55.  Tr. 328.  He opined that Lawrence had moderate limitations in his ability to relate to others, including fellow workers and supervisors, and in his ability to withstand stress and pressure associated with day-

to-day work activity.  Tr. 329.  He opined that Lawrence had mild limitations in his ability to

perform complex tasks, but no limitations in ability to maintain attention, concentration,

persistence and pace to perform simple repetitive tasks.  Tr. 329.  He opined that Lawrence had

no limitations in his ability to understand, remember, and follow simple instructions. Tr. 328

### 4.    State Agency Reviewing Physician

#### a.    David Dietz, Ph.D

On October 6, 2009, Dr. David Dietz, Ph.D., completed a Psychiatric Review Technique

and a Mental RFC.  Tr. 330-347.  Dr. Dietz found that Lawrence did not have an impairment that

met or equaled a Listing.[6]  Tr.  330-343.  Dr. Dietz opined that Lawrence's impairments resulted

in no limitations in activities of daily living; moderate limitations in maintaining social

functioning and in maintaining concentration, persistence or pace; and no episodes of

decompensation.  Tr. 340.

In the Mental RFC, Dr. Dietz rated 20 categories and found Lawrence moderately limited

in 7 categories,[7] not significantly limited in 2 categories and he found no evidence of limitation

in 11 categories.  Tr. 344-345.   In conclusion, Dr. Dietz opined that Lawrence is capable of most

work tasks that do not require more than superficial interaction with others or strict production

standards or schedules.  Tr. 346.

#### b.    Kristen Haskins, Psy.D

---

[6] Dr. Dietz assessed Lawrence's impairments under Listings 12.04 – Affective Disorders; 12.06 – Anxiety-Related
Disorders; and 12.08 – Personality Disorders, but did not find that Lawrence's impairments met or equaled any of
those Listings.  Tr. 330.

[7] Dr. Dietz found moderate limitations in Lawrence's ability to: work in coordination with or proximity to others
without being distracted by them; complete a normal workday and workweek without interruptions from
psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of
rest periods; interact appropriately with the general public; ask simple questions or request assistance; ability to
accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers
without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work
setting.  Tr. 344-345.

On March 23, 2010, as part of Lawrence's request for reconsideration, Dr. Kristen Haskins reviewed Dr. Dietz's earlier assessment.  Tr. 419.   Dr. Haskins noted that Lawrence had reported being stressed because his daughter had been molested by a family acquaintance and because he had a falling out with church elders.  Tr. 419.  She considered Lawrence's reports of increased bouts of depression but determined that his statements were only partially credible.  Tr.  419.  She reflected on the fact that Lawrence continued to attend church as regularly as he previously had and he continued to take his children to and from school.  Tr. 419.  She also indicated that there was nothing in his treating source records to suggest that his impairment caused marked or severe limitations in his ability to function.  Tr. 419.  Based on her review of the record and her assessment of Lawrence's statements, Dr. Haskins affirmed Dr. Dietz's prior opinions.  Tr. 419.

**C.    Testimonial Evidence**

**1.    Lawrence's Testimony**

Lawrence testified at the hearing with counsel present.  Tr. 59-80, 86-87.  He has no physical impairments.  Tr. 61, 76.  He is able to care for himself and assists with getting his children to and from school.  Tr. 61, 63-64.  He belongs to his church.  Tr. 62.  However, he indicated that the elders at his church are furious at him over his interpretation of certain bible passages and they will not let him participate very much any more except they do allow him to lead singing.  Tr. 73-74, 77.   He stated that he gets together with friends and family to play games but gets into arguments with them about the game rules.  Tr. 62, 78-79.  He also testified that he tries to avoid family gatherings as much as possible.  Tr. 77.   He stated that he has always fought with this sister and does not see eye to eye with his wife on a lot of things.  Tr. 78. His children all get irritated with him.  Tr. 78.  Unbeknownst to him, his wife indicated that

friends of theirs have to take a break from Lawrence because they cannot stand being around him too long.  Tr. 78.

He testified about his past employment including the game shop that he operated for about a year and half before closing the doors due his inability to make a profit.   Tr. 65-73.  He indicated that he has been unable to hold a job for very long because sooner or later he rubs people the wrong way.  Tr. 69.  He stated that he has become terrified of applying for jobs because he cannot bear to be asked about his past employment and previous firings.  Tr. 70-71.

He stated that certain medications that he takes for his mental condition make him very tired and he cannot remember things or concentrate.  Tr. 74. He can only read for about a half hour before he needs to take a break and then it is hard for him to get back to reading again.  Tr. 79.  Even when he was in school he was unable to focus on reading.  Tr. 79.

He indicated that he has constant thoughts of suicide but the medication does help; he does not feel quite as bad with the medicine.  Tr. 75.  He indicated that he does not want to actually commit suicide because God would "go ahead and throw me into hell" but he wishes that an accident would happen to him because then it would not be his fault.  Tr. 80.  He stated that, while his family might mourn and miss him, their lives would probably be better off because he would no longer be a drain on them.  Tr. 80.

### 2.    Vocational Expert's Testimony

 Vocational Expert Gene Burkhammer ("VE") testified at the hearing.  Tr. 80-86.  The VE summarized Lawrence's primary vocational work over the prior 15 years.  Tr. 81-82.  He classified Lawrence's prior work as: help desk operator for computers - skilled (SVP 7), sedentary position; digital video recorder installer and technician – skilled (SVP 7), medium

level position, as performed, but normally performed at the light level;[8] home health care equipment delivery driver – semi-skilled (SVP 3), medium level; and retail store owner – skilled (SVP 7), light level.[9]  Tr. 81-82.

The ALJ asked whether an individual, of the same age, education and employment background as Lawrence, who is capable of a full range of work except that the individual would need to have minimal contact with the public, superficial contact with coworkers and supervisors and should not work in close proximity to others, i.e., not closer than 10 feet or so would be able to perform any of Lawrence's past work.  Tr. 82-83.  The VE testified that such an individual would be capable of performing Lawrence's past work as a delivery driver.  Tr. 83.  The VE also testified that such an individual would be capable of performing other work in the regional and national economy and identified three available jobs:  laundry laborer - medium, unskilled (SVP 2) – 300 jobs locally, 3,000 jobs in Ohio and 50,000 jobs nationally; landscape specialist - medium, unskilled (SVP 2) – 400 jobs locally, 4,000 jobs in Ohio and 80,000 jobs nationally; and housekeeping cleaner – light, unskilled (SVP 2) – 2,000 jobs locally, 20,000 jobs in Ohio and 500,000 jobs nationally.  Tr. 83.   The VE did not identify any specific skilled jobs that might be available to the hypothetical individual but the VE indicated that, with the computer system knowledge that Lawrence has, there would likely be some computer jobs that might not require a lot of public or co-worker contact.  Tr. 83-84.

The ALJ then asked the VE to assume that the hypothetical individual would also have a poor ability to interact appropriately with the general public, accept instruction and respond

---

[8] Lawrence clarified that the digital recorder position involved providing assistance over the phone rather than in person.  Tr. 82.

[9] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

appropriately to criticism from supervisors, and poor ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  Tr. 84.  The VE indicated that it would probably be difficult for such an individual to retain any work in the economy.  Tr. 84.

Upon further questioning by Lawrence's counsel, the VE testified that, if the hypothetical individual would be off task 20 percent of the time due to sleepiness from medication and have poor concentration because of mental illness, the jobs previously identified by the VE would not be available.  Tr. 84.  The VE also testified that, if the hypothetical individual could not adapt to any changes at work, such an individual would be precluded from competitive work.  Tr. 84-86.

Following the VE's testimony, Lawrence offered that he had had prior cleaning jobs but was unable to perform as expected and the jobs did not work out.  Tr. 86-87.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

13

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her May 26, 2011, decision, the ALJ made the following findings:

1.      Lawrence meets the insured status requirements through September 30, 2012. Tr. 18.

2.      Lawrence engaged in substantial gainful activity from August 2007 through February 2009.[10]  Tr. 18-19.  He did not engage in substantial gainful activity at any other time since February 15, 2007, the alleged onset date.  Tr. 18-19.

---

[10] Plaintiff does not challenge the ALJ's finding that Lawrence was engaged in substantial gainful activity from August 2007 through February 2009.  Doc. 14; Doc. 16.

3.      Lawrence has the following severe impairments: bipolar disorder, obsessive compulsive personality disorder and anxiety disorder.  Tr. 19.

4.      Lawrence does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments.[11]  Tr. 19-20.

5.      Lawrence has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant can perform work with no more than minimal public contact or more than superficial contact with co-workers and supervisors.  He cannot work in close proximity with others.  Tr. 20-25.

6.      Lawrence is capable of performing past relevant work as a delivery driver and, alternatively, there are other jobs that exist in significant numbers in the national economy that Lawrence can perform: laundry laborer, landscape specialist and housekeeping cleaner.  Tr. 25-27.

Based on the foregoing, the ALJ determined that Lawrence had not been under a disability from February 15, 2007, through May 26, 2011, the date of the decision.  Tr. 27.

## V. Parties' Arguments

### A.      Plaintiff's Arguments

Lawrence presents three arguments.  Doc. 14; Doc. 16.  First, he argues that the ALJ's decision that Lawrence's mental impairments do not meet or equal a Listing is not supported by substantial evidence.  Doc. 14, pp. 9-12; Doc. 16.  Second, he argues that the ALJ failed to articulate valid reasons for rejecting treating and consulting source opinions.  Doc. 14, pp. 12-14; Doc. 16.  Third, he argues that the ALJ's Step Five decision is not supported by substantial evidence and that the ALJ should have relied on an alternative hypothetical.  Doc. 14, pp. 14-17; Doc. 16.

---

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

B.       **Defendant's Arguments**

In response, the Commissioner first argues that the ALJ's Step Three decision is supported by substantial evidence.  Doc. 15, pp. 11-13.  Second, the Commissioner argues that substantial evidence supports the ALJ's RFC and evaluation of medical opinion evidence.  Doc. 15, pp. 13-16.  Finally, the Commissioner argues that the Step Four finding and the alternative Step Five finding are supported by substantial evidence.  Doc. 15, pp. 16-18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.       **The ALJ's Step Three determination is supported by substantial evidence.**

Plaintiff asserts that the ALJ's Step Three analysis is flawed for a myriad of reasons and claims that remand is appropriate because the ALJ based her Step Three findings on state agency reviewing and consulting physicians' opinions; did not make reference to treating source notes or reports; did not call a medical expert; and did not properly explain her Step Three findings.  Doc. 14, pp. 9-12.  Despite his laundry list of alleged flaws with the Step Three analysis, Plaintiff has not demonstrated that the ALJ's Step Three findings necessitate a remand and the undersigned finds that the ALJ's Step Three analysis was proper and is supported by substantial evidence.

At Step Three of the disability evaluation process, a claimant will be found disabled if the claimant's impairment meets or equals one of the Listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.,* 381 Fed. Appx. 488, 491 (6th Cir. 2010). Each Listing specifies the objective medical and other findings needed to satisfy the criteria of that Listing. 20 C.F.R. § 404.1525(c)(3). A claimant must satisfy all of the criteria to "meet" the Listing. *Id.*; *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009). Alternatively, a claimant will be found disabled if her impairment is determined to equal a Listing, 20 C.F.R. § 404.1520(a)(4)(iii); *Turner,* 381 Fed. Appx. at 491, which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.1526(a).

At the ALJ level, responsibility for deciding medical equivalence rests with the ALJ. 20 C.F.R. § 404.1526(e). In determining medical equivalence, it is proper for an ALJ to rely upon a state agency medical consultant's opinion that a claimant's impairment(s) does not meet a Listing. Social Security Ruling 96-6p, 1996 WL 374180, * 3 (July 2, 1996). In addition to other recorded findings by medical consultants the signature of a State agency medical or psychological consultant on a Disability Determination and Transmittal Form ensures that a physician or psychologist designated by the Commissioner has given consideration to the question of medical equivalence. *Id.* The undersigned finds that the ALJ's reliance upon such opinions was proper under the Regulations and the Plaintiff has failed to demonstrate otherwise. *See* 20 C.F.R. § 404.1526(e); SSR Ruling 96-6p, 1996 WL 374180 at * 3. Thus, Plaintiff's request for a remand based on the ALJ's reliance on state agency medical consultant opinions is without merit. Further, Plaintiff acknowledges that the ALJ did address and discuss the Plaintiff's treating source records and opinions in her decision but argues that remand is

appropriate because the ALJ did not specifically discuss the Plaintiff's treating sources in her Step Three analysis. Doc. 14, p. 11-12.  As noted above, it is the ALJ's responsibility to determine medical equivalence and it was proper for the ALJ to rely on state agency physicians to reach her Step Three finding.  Plaintiff provides no contrary authority.  Moreover, when the ALJ's decision is considered as a whole, including the detailed Step Three analysis, and the fact that the ALJ did consider and evaluate treating source opinions when determining Lawrence's RFC, the Court finds no error in the ALJ's Step Three analysis by virtue of the fact that the treating source opinions were not specifically mentioned there.  *See e.g. Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339, *8-12 (N.D. Ohio June 17, 2011); *Malone v. Comm'r of Soc. Sec.*, 2011 WL 5520292, *1-3 (N.D. Ohio November 10, 2011).

An ALJ is not required to call a medical expert to determine medical equivalence under a Listing.  20 C.F.R. § 404.1527(e)(2)(iii) (providing ALJs with the authority to seek and consider medical expert opinions on the issue of whether a claimant's impairment equals a Listing, but not requiring an ALJ to call a medical expert); *see also Davis v. Chater*, 1996 WL 732298, *2 (6th Cir. 1996) (finding that, where an ALJ does not call a medical expert, a court is not precluded from finding that substantial evidence supports the ALJ's decision).  Here, there was sufficient evidence in the record for the ALJ to decide Lawrence's disability claim without expert medical testimony.  Therefore, the ALJ's decision not to solicit further expert medical testimony is not a basis to reverse the ALJ's decision.  *See Williams v. Callahan*, 1998 WL 344073, *4 n. 3 (6th Cir. 1998) (finding that, because the record contained the claimant's extensive medical history, the ALJ did not err in not soliciting expert medical testimony).

Finally, contrary to Plaintiff's position, the undersigned finds that the ALJ clearly explained her Step Three findings and those findings are supported by substantial evidence.  In

determining whether the Plaintiff met or equaled a Listing, the ALJ evaluated the "paragraph B" criteria under Listings 12.03, 12.05 and 12.08 and found that Plaintiff did not have marked restrictions in at least two of the following categories — activities of daily living; social functioning; maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of an extended duration.  Tr. 19-20.   A review of the decision clearly shows that the ALJ explained her reasons for finding that Plaintiff did not satisfy the "paragraph B" criteria.[12]  Tr. 19-20.   Plaintiff argues, however, that certain evidence demonstrates that the ALJ improperly found that Lawrence does not have marked limitations in social functioning, i.e., Lawrence does not shop on a regular basis, the church elders were mad at him, his wife says she cannot live with him if he does not take a certain medication, or he gets in arguments with friends after about an hour when playing games with them.  Doc. 14, p. 9.   However, the ALJ explained her reason for finding no marked limitation in social functioning and those reasons are supported by substantial evidence.  As an example, Plaintiff does not deny and the evidence supports that, notwithstanding the falling out that he had with church elders, he continued to attend church.  Tr. 77, 172, 209, 419.  Also, the record supports the fact that Plaintiff does maintain a relationship with his family; he takes his children to and from school and attends their extracurricular functions.  Tr. 62-64, 186.   Thus, there is substantial evidence to support the ALJ's finding.  Accordingly, reversal would not be appropriate even if the undersigned were to find that substantial evidence or, indeed, a preponderance of the evidence supports Plaintiff's position.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).   Further, even if Plaintiff's argument that he had marked limitations in social functioning (Doc. 14, pp. 9-10) had

---

[12] The ALJ also considered the "paragraph C" criteria and determined that Plaintiff did not satisfy those criteria, i.e., the ALJ found no evidence of episodes of decompensation and no evidence that an increase in mental demands or changes in environment would cause the Plaintiff to decompensate and no evidence that Plaintiff is unable to function outside a highly supportive living arrangement.  Tr. 20.  Plaintiff does not challenge the specific findings relative to the "paragraph C" criteria.

merit, Plaintiff would still not be able to satisfy a Listing because the ALJ did not find marked limitations in either of the other two categories and a review of the record demonstrates that the ALJ's findings are supported by substantial evidence.[13]

Moreover, to the extent that Lawrence attempts to argue that there is treating source evidence to support a finding that his impairment equals a listing, he has not identified the treating source records or opinions that demonstrate that his condition is just as severe as a listed impairment. Doc. 16, pp. 4-5. Accordingly, Plaintiff's argument is deemed waived since he has not provided a basis for it. *McPherson,* 125 F.3d at 995–96 ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

For the foregoing reasons, the undersigned finds that the ALJ did not err at Step Three and her Step Three findings are supported by substantial evidence. Therefore, a remand is not warranted.

**B.      The ALJ properly considered and evaluated medical opinion evidence.**

Plaintiff takes issue with the ALJ's consideration and assessment of reports from treating sources Dr. Ki-Moon Hong, counselor Michael Hovancsek and Dr. Yuan-Hua Thakore. Doc. 14, pp. 12-14. Applying the treating physician rule to the ALJ's decision, the undersigned finds that the ALJ properly considered and weighed the medical opinions.

Under the treating physician rule, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the

---

[13] To the extent that Plaintiff attempts to argue that Lawrence has marked limitations in any other category, such arguments are not clearly articulated, and thus are considered waived. *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted).

case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must provide "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, while a decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

> **1.      Dr. Ki-Moon Hong June 19, 2007, Questionnaire**

Plaintiff acknowledges that the ALJ considered Dr. Hong's June 19, 2007, questionnaire regarding the Plaintiff's functioning (Tr. 303-305), but asserts that the ALJ's reasons for giving the opinion less than controlling weight were improper.  Doc. 14, pp. 12-13.  In accordance with the treating physician rule, the ALJ gave "good reasons" for discounting Dr. Hong's opinion and sufficiently explained those reasons, i.e., Dr. Hong's opinion was issued less than one month after Plaintiff had been receiving treatment from Portage Path and less than one week after Plaintiff restarted his bipolar medication and Plaintiff's own activities, including the start-up of his own business, indicated a greater level of functioning than suggested by Dr. Hong's responses on his questionnaire.  Tr. 22, 302-305.  As noted by the ALJ, Dr. Hong's June 19,

2007, questionnaire reflected a prior June 12, 2007, evaluation at Portage Path completed by a different physician, Dr. Wilke.  Tr. 22, 300-302.  The ALJ's reasons coupled with the fact that Dr. Hong did not personally treat Lawrence are sufficiently clear and provide support for the ALJ's decision to give "some weight" to Dr. Hong's opinions.  For the foregoing reasons, the ALJ did not err in her treatment of Dr. Hong's July 19, 2007, opinion.

     **2.**       **Counselor Michael Hovancsek and Dr. Yuan-Hua Thakore July 21, 2009, Questionnaire**

Plaintiff takes issue with the ALJ's statement that "[a]lthough Mr. Hovancsek and Dr. Thakore did not discuss the claimant's specific work capacity in this [their] statement, the undersigned took their statement into consideration in the residual functional capacity."  Doc. 14, p. 13; Tr. 23.  As the ALJ indicated, the July 21, 2009, Questionnaire completed by Mr. Hovancsek and Dr. Thakore did not specifically offer opinions as to Lawrence's work-related limitations.  Tr. 318-321.  Since the Questionnaire does not contain opinions about what Lawrence can do despite his impairments and his physical and mental restrictions, the Questionnaire is not a "medical opinion" and, thus, it does not fall under the "treating physician rule."  20 C.F.R. 404.1527(a)(2).  Even if the Questionnaire were considered a "medical opinion," the ALJ did consider it and accounted for Lawrence's tendency to have personal conflicts with others, i.e., the RFC limited Lawrence to work that involved no more than minimal public contact or more than superficial contact with co-workers and supervisors and indicated that Lawrence could not work in close proximity to others.  Tr. 20.  Thus, for the foregoing reasons, the ALJ did not err in her treatment of Mr. Hovancsek's and Dr. Thakore's July 21, 2009, Questionnaire.

### 3.      Michael Hovancsek July 6, 2010, Medical Source Assessment

Plaintiff argues that, although the ALJ said she credited Mr. Hovancsek's July 6, 2010, assessment regarding Lawrence's ability to interact with others, the ALJ did not include Mr. Hovancsek's specific limitations in the RFC, i.e, inability to work in coordination or proximity to others without being distracted by them; inability to interact appropriately with the general public; inability to accept instructions and responding appropriately to criticism from supervisors; and difficulty in carrying out detailed instructions for more than 20% of the workday or workweek.  Doc. 14, pp. 13.  The ALJ is responsible for assessing an individual's RFC and, in doing so, the ALJ is to determine what a claimant can do despite his limitations.  20 C.F.R. §§ 404.1545; 404.1546(c).  Mr. Hovancsek is not a physician and, therefore, his July 6, 2010, Questionnaire is not entitled to controlling weight under the "treating physician rule."  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. Appx. 496, 507 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.*, 152 F. Appx. 485, 490 (6th Cir. 2005).  The ALJ did consider and gave weight to Mr. Hovancsek's opinion.  However, since controlling weight was neither given nor required to be given, the ALJ, who is responsible for assessing the RFC, incorporated into the RFC, those limitations that the ALJ determined to be supported by the record, including limitations in accord with limitations in Mr. Hovancsek's July 6, 2010, assessment.  Thus, the RFC provides that Lawrence is limited to work that involves no more than minimal public contact or more than superficial contact with co-workers and supervisors and provides that Lawrence cannot work in close proximity with others.  Tr. 20.   For the foregoing reasons, the ALJ did not err in her treatment of Mr. Hovancsek's July 6, 2010, Questionnaire.

**C.     The ALJ's Step Four and alternative Step Five findings are supported by substantial evidence.**

Plaintiff argues that the ALJ relied on the VE's response to an incomplete hypothetical and should have relied on the VE's response to the ALJ's second hypothetical or to one of Plaintiff's counsel's hypotheticals.  Doc. 14, pp. 14-17.  In essence, Plaintiff argues that the ALJ was required to accept and rely on a hypothetical that incorporated every limitation or restriction. "Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  The ALJ's RFC, which is substantially similar to the first hypothetical, is based on substantial evidence.  Therefore, Lawrence's argument that it was improper for the ALJ to rely on the VE's testimony in support of her conclusions is without merit.

### VII. Conclusion and Recommendation

For the foregoing reasons, it is recommended that the Commissioner's decision be **AFFIRMED**.

Dated:   December 3, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).